**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MELISSA STANLEY, individually and as representative of a class of participants and beneficiaries on behalf of The George Washington University Retirement Plan for Faculty and Staff and The George Washington University Supplemental Retirement Plan, | Civil Action No. |
| 2440 SE Ocean Blvd. Apt. C 102, Stuart, FL 34996-3335, | |
| Plaintiff, | |
| v. | |
| THE GEORGE WASHINGTON UNIVERSITY, THE GEORGE WASHINGTON UNIVERSITY BOARD OF TRUSTEES, and THE GEORGE WASHINGTON UNIVERSITY PLAN ADMINISTRATION COMMITTEE, | **JURY TRIAL DEMANDED** |
| 2121 Eye St. NW, Washington D.C. 20052, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Melissa Stanley ("Plaintiff"), individually and as representative of a class of participants and beneficiaries in The George Washington University Retirement Plan for Faculty and Staff (the "Base Plan") and The George Washington University Supplemental Retirement Plan (the "Supplemental Plan") (collectively, the "Plans"), brings this action and files this Class Action Complaint ("Complaint") under 29 U.S.C. § 1132(a)(2) on behalf of the Plans and their participants against Defendants The George Washington University ("GWU"), The George

Washington University Board of Trustees ("Board of Trustees"), and The George Washington University Plan Administration Committee ("Plan Administration Committee") (collectively "Defendants"), seeking redress for their breaches of fiduciary duties under, and violations of, the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA").

## I.    <u>INTRODUCTION</u>

1.    Every year, millions of employees entrust their retirement savings to retirement plans established under ERISA. ERISA plans are protected by their fiduciaries, who are obligated to act prudently and loyally to safeguard plan participants' retirement dollars. Failures by ERISA fiduciaries have stark financial consequences for the participants. Every extra point of expenses imposed upon participants and every dollar lost by virtue of underperforming investment options compounds over time, draining the value of participants' investments available upon retirement.

2.    The Plans are among the largest defined contribution retirement savings plans in the country: the Base Plan has 14,174 participants and over $866 million in assets as of the end of plan year 2016, and the Supplemental Plan has 11,799 participants and approximately $1.08 billion in assets as of the end of plan year 2016.

3.    The fiduciaries to the Plans abdicated their fiduciary duties to act prudently. Instead, they turned the Plans over to conflicted third-party service providers – Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA" or "TIAA-CREF"), Fidelity Investments Institutional Operations Company and/or Fidelity Management Trust Company ("Fidelity"), and AXA Equitable ("AXA"). Those service providers poured the Plans' funds into duplicative, expensive, and underperforming TIAA proprietary annuity products, and TIAA, Fidelity, Vanguard, and AXA mutual fund products.  By doing so, TIAA, Fidelity (which also injected Vanguard funds into the Plans), and AXA reaped multiple layers of fees, and

the Plans and the participants lost the potential growth their investments could have achieved had the Defendants properly discharged their fiduciary duties.

4.     The duties of loyalty and prudence are among the highest duties known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries. As fiduciaries to the Plans, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plans' investments are prudent. Because the marketplace for retirement plan services is established and highly competitive, and because the Plans collectively have nearly two billion dollars in assets, the Plans have tremendous bargaining power to demand low-cost administrative and investment management services and well-performing investment options.

5.     But instead of leveraging this substantial bargaining power to benefit participants and beneficiaries, Defendants caused the Plans to pay unreasonable and excessive fees for investment and administrative services. Further, Defendants selected and retained investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive investment management fees.

6.     Rather than negotiating separate, reasonable, capped fees for recordkeeping, Defendants continuously retained share classes of Plans investment options that charged higher fees than other less expensive share classes that were available for the same funds.  As a result, Plaintiff and Class members paid an asset-based fee for administrative services that continued to increase with the increase in the value of a participant's account even though no additional services were being provided.

7.     Additionally, Defendants, as fiduciaries, have attempted to insulate themselves from liability by including a large number of investment alternatives in the Plans' portfolios and then

shifting to the participants the responsibility for choosing among them—a practice the U.S. Department of Labor ("DOL") has described as obvious, even reckless, imprudence in the selection of investments for a plan.

8.     Further, Defendants failed to regularly monitor the investment choices in the Plans to determine whether the Plans provided an appropriate range of investment choices into which participants could direct the investment of their retirement dollars.

9.     Defendants selected as the Plans' principal capital preservation fund an insurance company fixed-income account—the TIAA Non-Benefit Responsive Traditional Annuity (the "Traditional Annuity")—that prohibited participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives changed. The Traditional Annuity also prohibited participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

10.     One could reasonably infer from these circumstances alone that the Defendants' fiduciary decision-making process was either flawed or badly executed, but there is substantial additional evidence of a flawed process, such as the inclusion of a dizzying array of about 45 investment options from TIAA, more than 20 investment options from Vanguard, nearly 50 investment options from Fidelity, and—in the Supplemental Plan—nearly 20 additional options from AXA, year in and year out.

11.     As a result of Defendants' breaches of their fiduciary duties, Plan participants were damaged because, among other things:

a. They paid higher recordkeeping fees than necessary, because Defendants permitted TIAA, Fidelity, and AXA to charge such fees based on a percentage of assets invested instead of based on the number of plan participants;

b. With respect to many funds, they paid the higher retail investment class fees paid by small investors even though, based on the size of the Plans, lower-fee class versions of the identical funds were available to the Plans; and

c. They were burdened with many duplicative funds, including poorly-performing funds, "bundled" into the Plans by service provider mandates, which resulted in higher fees and/or poorer investment returns, thereby enriching TIAA and the other service providers at the expense of participants.

12.     To remedy these fiduciary breaches, Plaintiff, individually and as representatives of a class of participants and beneficiaries in the Base Plan and Supplemental Plan, bring this action on behalf of the Plans under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plans all losses resulting from each breach of fiduciary duty. In addition, Plaintiff seeks such other equitable or remedial relief for the Plans as the Court may deem appropriate.

13.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including but not limited to review of Plan filings with the DOL, other publicly available documents, documents provided to Plaintiff a participant in the Plans, and other analytical investment data. As Plan fiduciaries, Defendants have possession of additional material information relating to the claims herein, and Plaintiff reserves the right to amend this Complaint as those materials become available during the course of this litigation.

## II.   JURISDICTION AND VENUE

14.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under ERISA pursuant to 29 U.S.C. § 1132(a)(2) and (3).

15.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the District where at least one of the alleged breaches of fiduciary duty occurred, it is the District where GWU is located, and it is the District where Defendants are deemed to reside.

16.     Plaintiff has Article III standing, as she has suffered an injury-in-fact that is causally connected and fairly traceable to Defendants' conduct, and which injury is likely to be redressed by a favorable decision. Plaintiff also has standing to bring this lawsuit on behalf of the Plans under § 1132(a)(2). The Plans are the victim of a fiduciary breach and the recipient of any recovery. Section 1132(a)(2) authorizes any participant to sue as a representative of the Plans to seek relief on behalf of the Plans. As explained in detail below, the Plans suffered millions of dollars in losses and harm caused by Defendants' fiduciary breaches and remain exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

## III.   THE PLANS

### A.   The George Washington University Retirement Plan for Faculty and Staff – 401(a) Plan

17.     The George Washington University Retirement Plan for Faculty and Staff (or Base Plan) is a defined contribution, individual account, money purchase employee benefit pension plan governed by Section 401(a) of the Internal Revenue Code and subject to ERISA under 29 U.S.C. § 1002(2)(A) and § 1002(34).

18.     A defined-contribution plan is a retirement plan in which the value of a participant's retirement accounts is determined solely by (and thus limited to) employee and employer contributions plus the amount gained through investment in the options made available in the plan (less expenses). In these types of plans, employees ordinarily contribute a percentage of their pre-tax earnings to a plan through an individual account, which is invested in investment options selected by the plan's fiduciaries.

19.     Per the Base Plan's Summary Plan Description ("Base Plan SPD"), GWU employees who are on the university's payroll, whose wages are subject to FICA, and who have completed two years of service (as described in the Base Plan SPD) are eligible to enroll in the Base Plan. Under the Base Plan, contributions are based upon employee compensation. Only GWU makes contributions to the Base Plan. The first type of contributions to the Base Plan are Base Contributions, whereby GWU contributes an amount equal to 4% of employee compensation (as that term is defined in the Base Plan SPD) for each plan year in which an employee is a participant in the Base Plan. In addition to the Base Contributions, GWU also makes Matching Contributions to the Base Plan, whereby GWU matches 150% of the first 4% of participants' elective deferral contributions to the 403(b) Supplemental Plan, up to a maximum of 6% of compensation.

20.     As of December 31, 2016, the Base Plan held more than $866 million in assets and had approximately 13,714 participants with account balances. The Base Plan is among the largest of all defined contribution plans in the United States based on total assets.

**B.      The George Washington University Supplemental Retirement Plan – 403(b) Plan**

21.     The George Washington University Supplemental Retirement Plan (or Supplemental Plan) is a defined contribution, individual account, 403(b) employee pension benefit plan under ERISA, 29 U.S.C. § 1002(2)(A) and § 1002(34).

22.     Per the Supplemental Plan's Summary Plan Description ("Supplemental Plan SPD"), GWU employees who are on the university's payroll and whose wages are subject to FICA are eligible to enroll in the Supplemental Plan. Eligible employees make contributions to a Supplemental Plan individual account through elective deferral and pursuant to a compensation reduction agreement. Employee compensation is reduced by the amount elected by each employee and contributed into their individual accounts.

23.     As of December 31, 2016, the Supplemental Plan held more than $1.08 billion in assets and had approximately 11,799 participants with account balances. The Plan is among the largest of all defined contribution plans in the United States based on total assets. Plans of such great size are commonly referred to as "jumbo plans."

24.     As stated above, employer contributions to the 401(a) Base Plan are based upon employee participation in the 403(b) Supplemental Plan. GWU matches 150% of the first 4% of participant elective deferral contributions to the Supplemental Plan, up to a maximum of 6% of compensation. This match is made *via* contributions to the Base Plan. Contributions to the Base Plan are dependent upon employee participation in the Supplemental Plan.

25.     The majority of fees assessed to the Plans' participants are attributable to two general categories of services: plan administration (including recordkeeping) and investment management. These expenses significantly reduce the value of an account in the Plans. The Plans' fiduciaries control plan expenses, including those associated with the service providers selected and hired to administer the Plans (e.g., recordkeepers). The Plans' fiduciaries are also responsible for negotiating and approving fees paid to the Plans' service providers, whether directly or indirectly paid. The Plans' fiduciaries control the menu of investment options offered in the Plans.

Investment selections each have their own fees, which are deducted from the returns that participants receive on their investments.

26.     The Plans are established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

27.     The Plans provide the primary source of retirement income for many employees of GWU. The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plans by Defendants, net of fees and expenses. Participants have the right to direct the investment of their accounts among the available investment choices.

28.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion). With an aggregate value of nearly $2 billion in assets as of December 31, 2016, the Plans, taken together, amply qualify as a "Mega" or "Jumbo" plan.

## IV.   **THE PARTIES**

### A.   **Plaintiff**

29.     Plaintiff Stanley is a resident of Stuart, Florida. Plaintiff Stanley is a participant in the Plans as defined under 29 U.S.C. § 1002(7) because she has a vested account balance in the Base Plan and Supplemental Plan, and her beneficiaries are or may become eligible to receive benefits under the Plans.  Through the Plans she is currently invested, or during the Class Period was invested, in the TIAA Traditional Annuity (in both the Base Plan and Supplemental Plan) and the CREF Stock Account (in the Base Plan).

### B.   **Defendants**

30.     Defendant The George Washington University is a private university located at 2121 Eye Street, NW, Washington, D.C. 20052.

31.     Originally named the Columbian College, GWU was founded in 1821 pursuant to an Act of the United States Congress which granted the school a Congressional charter. The charter provides for a Board of Trustees, and GWU acts through its Board of Trustees as well as its executive leaders and administrators. Upon information and belief, GWU, acting through the Plan Administration Committee, the Executive Vice President and Treasurer, and the Associate Vice President of Tax, Payroll, and Benefits, has all discretionary authority and powers necessary to administer the Plans. Upon information and belief, GWU and the Board of Trustees delegated to the Plan Administration Committee, the Executive Vice President and Treasurer, and the Associate Vice President of Tax, Payroll, and Benefits the authority to oversee the investment options provided under the Plans or otherwise administer the Plans, or to delegate these functions.

32.     Defendant The George Washington University Board of Trustees is the governing body of GWU which, according to GWU's website, is currently comprised of 43 members, including the President of the university, who serves as an *ex officio* member.

33.     Defendant The George Washington University Plan Administration Committee is designated as the Plan Administrator of both Plans pursuant to 29 U.S.C. § 1002(16)(A)(i) and is responsible for the management of the Plans.

34.     Upon information and belief, GWU, the Board of Trustees, and the Plan Administration Committee were and are responsible for selecting and overseeing the investment options provided under the Plans and otherwise administering the Plans.

35.     Defendants are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management or disposition of Plan assets, and

have discretionary authority or discretionary responsibility in the administration of the Plans, as described in more detail below. 29 U.S.C. §1002(21)(A)(i) and (iii). Defendants acknowledge the following in the Plan SPDs:

> ### Prudent Actions by Plan Fiduciaries
>
> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the Plan's operation. The people who operate the Plan, called "Plan fiduciaries," have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

36.     Defendants, and each of them, are now and/or at all times mentioned in this Complaint were in some manner legally responsible for the events, happenings and circumstances alleged in this Complaint. Defendants proximately caused the Plans, Plaintiff, and all others similarly situated to be subjected to the unlawful practices, wrongs, complaints, injuries, and/or damages alleged in this Complaint. Defendants, and each of them, are now and/or at all times mentioned in this Complaint were the agents, servants, and/or employees of some or all other Defendants, and vice-versa, and in doing the things alleged in this Complaint, Defendants are now and/or at all times mentioned in this Complaint were acting within the course and scope of that agency, servitude, and/or employment.

## V.     FACTS APPLICABLE TO ALL COUNTS

### A.     Overview of the Plans' Investments

37.     Defendants exercised and continue to exercise discretionary authority over the investment options that are included in the Base Plan and Supplemental Plan. The Plans' investments are designated by Defendants as available investment alternatives offered under the Plans.

38.     Throughout the Class Period, the Plans' investment menus have largely overlapped

in terms of their offerings.

39.    Each Plan offers about 45 investments choices managed by TIAA-CREF, including variable annuities, mutual funds, and a pooled separate account.

40.    From year to year in the Class Period, the Plans have also offered in excess of 80 investment options through Vanguard, Fidelity, and AXA. The Fidelity and Vanguard investments are mutual funds, while the AXA investments (available only in the Supplemental Plan) are variable annuity products.

41.    The TIAA Traditional Annuity is offered in both Plans. It is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

42.    The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, for participants who invest in the TIAA Traditional Annuity through a Group Retirement Annuity  contract, like the one held in the Plan, lump-sum withdrawals are available from the Traditional Annuity only within 120 days after termination of employment and are subject to a 2.5% surrender charge. All other withdrawals and transfers from the account must be paid in ten annual installments.  Rather than being available to participants if they wish to liquidate their funds earlier, a participant's investment in the TIAA Traditional Annuity can be withdrawn only over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without a substantial penalty can only do so over ten years.

43.    Also available in both Plans are the CREF Stock Account, CREF Money Market

Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Index Account, and CREF Bond Market Account. These are TIAA-proprietary variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investments in these variable annuities changes over time based on investment performance and expenses of the accounts.

44.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges.  For the R1 share class—which was the only share class available prior to 2015—those expenses consisted of the following:

> a. "administrative expense" charge (39.5 bps);[1]
>
> b. "distribution expense" charge (16.5 bps);
>
> c. "mortality and expense risk" charge (0.5 bps); and
>
> d. "investment management expense" charge (ranging from 4 to 15 bps).

45.     The TIAA Real Estate Account—also available in both Plans—is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

> a. "administrative expense" charge (26.5 bps);
>
> b. "distribution expense" charge (12.5 bps);

---

[1] One basis point (or bps) is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

      c. "mortality and expense risk" charge (0.5 bps);

      d. "liquidity guarantee "(17 bps); and

      e. "investment management expense" charge (32 bps).

As of May 1, 2017, distribution fees were reduced to 10.5 basis points, but the fee for the liquidity guarantee was increased to 20 basis points. The current expenses for the Real Estate Account are 85 bps.

46.    The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class. Until 2013, these TIAA mutual fund products were offered only in expensive retail shares when identical, cheaper shares (e.g., institutional shares) were otherwise available.

**B.**    **Defendants' actions caused the Plans' participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

47.    Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to mega or jumbo defined contribution plans, like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

48.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans solicit competitive bids for recordkeeping and administrative services at regular intervals of approximately five years.

49.     The cost of recordkeeping and administrative services depends on the number of participants.  The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

50.     Large and mega/jumbo defined contribution plans, like the Plans, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in these plans increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

51.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, that is, recordkeeping expense calculated as a percentage of total plan assets, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable

recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to include the investment company's high-priced funds included as plan investment options.

52.     Accordingly, a flat price based on the number of participants in a plan ensures that the amount of compensation is tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, e.g., an increase in assets in the plan. Vanguard has recognized this principle in a company white paper called *Shining a Light on ERISA Budget Accounts*:

> In the past, defined contribution (DC) plan sponsors and service providers typically treated revenue generated from the plan's assets as the primary method of payment for recordkeeping service fees. This recordkeeping revenue has grown over the years due to regular employer and employee contributions and market appreciation of plan assets.

> Plan sponsors and recordkeepers have worked together to ensure that the revenue-sharing amount received by the recordkeeper doesn't exceed the amount specified for the price of administrative services. This can be accomplished through a variety of arrangements, such as *adopting lower-priced share classes* (with a corresponding reduction in credits or revenue sharing for recordkeeping) or *transitioning from asset-based fees to flat, per-participant fees*. (emphasis added).

53.     TIAA, Fidelity, and AXA were compensated for recordkeeping services as part of the indirect compensation structure based on asset management fees. Because revenue sharing payments are asset-based, the fees can grow to unreasonable levels if plan assets grow but the number of participants, and thus the services provided, do not increase at a similar rate.

54.     Under DOL regulations that became effective January 1, 2009, certain employers with 403(b) plans became compelled to exercise greater control over their 403(b) plans than in the past. The regulations were expressly intended to make 403(b) plans more like 401(k) plans.

55.     Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for

benefits under the plan.

56.     Once the final regulations were published, many plan fiduciaries recognized that fulfilling their fiduciary obligations required them to engage in a comprehensive review of plan fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants.

57.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages all plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

58.     Even Duke University, which is the subject of a similar lawsuit, has finally made the decision to switch to a one-recordkeeper setup (beginning 2019), where Fidelity will be the sole recordkeeper, and TIAA, Vanguard, and Valic will be eliminated as plan recordkeepers. TIAA's funds will, for the most part, be eliminated from the Duke plan's investment lineup.[2]

59.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).[3]

60.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

       **1. The choices are overwhelming**. Numerous studies have demonstrated

---

[2] *See* Gretchen Morgenson, *Some Colleges Bail from TIAA, Objecting to Increase in Fund Fees*, The Wall Street Journal, https://www.wsj.com/articles/small-u-s-colleges-join-forces-in-effort-to-lower-retirement-plan-costs-1523007001 (last visited April 9, 2018).

[3] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

that when people are given too many choices of anything, they lose confidence or make no decision.

**2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[4]

61.     The benefits of using a single recordkeeper in a retirement plan are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[5]

62.     In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", Aon Hewitt similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It (Jan. 2016).

63.     Another independent investment consultant, Towers Watson, also recognized that

---

[4] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[5] *Id.*

using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[6]

64.     Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[7] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[8]   Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees

---

[6] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[7] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[8] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[9]

65.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, during most of the Class Period, Defendants continued to contract with *two* or *three* recordkeepers (TIAA-CREF, Fidelity, and AXA) for years. The inefficient and costly structure maintained by Defendants caused Plans' participants to pay duplicative, excessive, and unreasonable fees for recordkeeping and administrative services. There was no prudent reason for Defendants' failure to engage in a process to reduce duplicative services and fees.

66.     Each Plan offered an unnecessary and highly confusing array of investment choices, with roughly 45 investment options (annuity and mutual fund products) offered by TIAA-CREF, in excess of 20 mutual funds offered by Vanguard, nearly 50 mutual funds offered by Fidelity, and—in the Supplemental Plan—nearly 20 additional annuity products offered by AXA.

67.     The recordkeepers for the Plans received compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and their investments for providing these duplicative services.

68.     Upon information and belief and according to industry experts and the prospectus

---

[9] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments prior to 2015 were:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 56 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15 bps |

69.     Until December 31, 2014, JPMorgan Chase Bank, N.A. was the custodian for the Plan's investment in TIAA-CREF products. Since then TIAA-CREF has served as trustee for those investments.

70.     Fidelity is compensated for recordkeeping services related to its custodial services in administering the Plans and based on revenue sharing it received from its nearly 50 mutual fund offerings sold to the Plans.

71.     Vanguard mutual funds are offered through Fidelity as custodian, and Vanguard is compensated for recordkeeping services based on internal revenue sharing it received from their mutual funds sold to the Plans.

72.     Until 2009, AXA was an investment provider in the Supplemental Plan. Supplemental Plan dollars remain in AXA annuity products. AXA continues to serve as the custodian for the Supplemental Plan's investments in proprietary AXA products. AXA is compensated for recordkeeping services related to its investment products in the Supplemental Plan and upon information and belief continues to be compensated based on revenue sharing it received from its annuity offerings that continue to hold assets in the Supplemental Plan.

73.     The Plans has previously permitted JPMorgan and TIAA (as agents of one another) Fidelity, and AXA—and continues to permit TIAA, Fidelity, and AXA—to be compensated for recordkeeping services as part of the indirect compensation structure based on asset management fees. Because revenue sharing payments are asset-based, the fees can grow to unreasonable levels if plan assets grow while the number of participants has not increased at a similar rate. Throughout the Class Period, Defendants have compensated the Plans' recordkeepers through revenue sharing payments from the Plans' investment products and mutual funds, which has led to payment of excessive fees.

74.     In addition, the Plans' recordkeepers received additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

75.     An examination of the prospectuses for the TIAA investment options and the Plans' financial data makes clear that the Plans have paid at least hundreds of dollars per participant per year for recordkeeping since 2012—much higher than a reasonable fee for these services, and resulting in millions of dollars in excessive recordkeeping fees each year.

76.     Based on an examination of the Plans' Forms 5500, TIAA received indirect compensation of millions of dollars for recordkeeping and administrative services from only the CREF variable annuities, the TIAA CREF Real Estate Account, and the TIAA Traditional Annuity, without regard to any other indirect compensation received from, for example, plan loans and revenue sharing from the TIAA mutual funds.  None of this indirect compensation is reported on any of the Plans' Annual Returns filed with the DOL Employee Benefit Security Administration ("EBSA") on Form 5500.

77.     The impact of excessive fees on employees' and retirees' retirement assets is

dramatic. EBSA has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[10]

78.     Defendants have also failed to control recordkeeping costs as the Plans' assets grew, both during and prior to the Class Period. From December 31, 2009 to December 31, 2016, the Base Plan's assets increased by more than 70% from approximately $506 million to approximately $866 million, and the Supplemental Plan's assets increased by nearly 40% from approximately $792 million to approximately $1.08 billion. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' recordkeepers became even more excessive as the Plans' assets grew, even though the administrative services provided to the Plans remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plans as other prudently administered plans do, but failed to do so.

79.     Defendants failed prudently to monitor and control the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' recordkeepers. Had Defendants monitored the compensation paid to the Plans' recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings in the last six years alone.

80.     Forms 5500 are essentially the Plans' annual tax returns. The Plans' Annual Reports filed with the DOL on Form 5500 disclose indirect compensation is paid to TIAA and Fidelity, but

---

[10] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

do not disclose the actual amount of indirect compensation paid.

### C. **Defendants breached their fiduciary duties by acquiescing in the recordkeepers' bundling of products, which benefited the recordkeepers to the detriment of the Plans' participants.**

81.    Many service providers market and offer "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment products as well as administrative and recordkeeping services. These plans are often marketed as "free" plans, meaning there are supposedly no additional fees beyond the revenues the provider receives from having their proprietary products offered in the plan. In order to obtain the "free" pricing, the fiduciary must agree to put the provider's preferred investment lineup in the plan—a group of handpicked, typically proprietary funds guaranteeing that the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan is established would require the provider's approval or result in the plan being assessed additional direct fees.  In addition, the mandatory inclusion of proprietary products saddles a plan with multiple underperforming products that could have been substituted, by a faithful fiduciary, with a more focused menu of reasonably priced options.

82.    Thus, under these closed arrangements, investment options are included in some defined contribution plans not based on an independent analysis of their merits or what is in the best interests of participants, but instead because of the benefits they provide to the plan's service providers.

83.    As identified by Peter Mooney, CEO of The Ancora Group's subsidiary Source Companies LLC, in an interview with Smart Business:

> When you use a bundled product, that plan is not owned by you, the employer. Instead, it is owned by the investment company, which negotiates each of the components and their fees, and then sells them bundled together.

As a result, you are tied to whatever the investment company has negotiated. If you are not happy with some component of the plan, you must sell all the assets, move the entire plan to another investment company and then repurchase the assets. That also requires terminating the relationship with your third-party administrator and setting up a relationship with a new one.

84.     Furthermore, as noted by Carole Luckenbach, CEBS, in *Incorporating Best Practices Into Your 403(b) Plan*, plans entailing bundled services and products charge fees as a percentage of assets and generally "do not provide fee and revenue transparency."

85.     Unlike the bundling model, in an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products and the plan fiduciary is free to reject the recordkeeper's conflicted proprietary fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include these more prudent funds in the plan's investment lineup.

86.     Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price.

87.     As further identified by Luckenbach:

In contrast to a bundled plan, an open investment architecture plan allows the plan sponsor to hire a best-in-class recordkeeper/administrator that is independent from the menu of investment products (no requirement to offer proprietary investment products such as annuities or mutual funds). The goal of this approach is to provide participants access to the lowest cost investment options in a transparent environment. As a result, the investment lineup can be determined without restriction and offer the most competitive investment products that are better suited for participants.

***

A better model . . . would include an open architecture with a quality recordkeeper and best-in-class investment options. Fees for the recordkeeping/administration could be paid by an annual per-participant fee (versus the asset-based fee model). The recordkeeping/administrative fees would be charged equitably to all participants with fees tied to administrative services. The plan sponsor can solicit bids for recordkeeping/administrative services based on the strength of the vendor's capabilities and engage in a separate process to determine prudent investment options. The investment options can be selected by an independent investment advisor.

88.     Prudent fiduciaries of large defined contribution plans like the Plans have largely rejected bundling and embraced open architecture platforms due to the higher level transparency of this model.

89.     Unfortunately, as a result of Defendants' fiduciary breaches, the Plans have failed to embrace the open architecture platform and instead engaged service providers offering services and investment products on an inefficient, overpriced, and imprudent bundled basis.

90.     Service providers like TIAA, Fidelity, and AXA have substantial economic interest to bundle and include as many of their proprietary products into the Plan as possible, and to structure their compensation to maximize their own interests, including maximizing fees. Defendants have permitted TIAA, Fidelity, and (previously) AXA for years to provide services, including recordkeeping services, on a bundled basis by which primarily those companies' own proprietary investment products were and continue to be included as options on the Plans' investment menus, regardless of the prudence, performance, or fee-structure of those investments options. And TIAA, Fidelity, and AXA collected (and continue to collect) fees relating not only to their recordkeeping in their investment products, but also for investment management of the underlying Plan options.

91.     TIAA provides and provided plan services exclusively on a bundled basis. TIAA clarifies this in its own literature:

TIAA-CREF is a "bundled" service provider, meaning that many of the services needed to support retirement plans, such as investment management, recordkeeping, administration and participant communications, are provided through a single service provider, namely TIAA-CREF.

92.     If a plan wishes to offer the TIAA Traditional Annuity, TIAA requires that the CREF Stock Account, Money Market Account, and  many other TIAA proprietary products also be included in the plan, and requires the plan to use TIAA as recordkeeper for its proprietary products.

93.     Colleges across the United States have begun moving away from TIAA's proprietary products because of TIAA's fee structure, with the goal of reducing retirement plan fees.[11]

94.     There is no shortage of high-quality, low-cost alternatives to TIAA's products in the defined contribution plan market. For example, many plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost.

95.     Plans that have put their recordkeeping services out for competitive bidding have determined that moving away from TIAA was a prudent, cost-reducing measure for the plan. With reducing plan costs in mind, other plans have also decided to (a) not include TIAA's proprietary

---

[11] *See* Gretchen Morgenson, *Some Colleges Bail from TIAA, Objecting to Increase in Fund Fees*, The Wall Street Journal, https://www.wsj.com/articles/small-u-s-colleges-join-forces-in-effort-to-lower-retirement-plan-costs-1523007001 (last visited April 9, 2018).

funds and/or (b) decline to pay for TIAA investment advice/services for plan participants.[12]

96.    In addition, for years, Fidelity (with the inclusion of Vanguard products), TIAA, and AXA together have provided the investment menu and administrative services in the Plans in exchange for indirect compensation. Thus, the Plans maintained two or three recordkeepers compensated based on the revenue sharing in the proprietary investments of TIAA, Fidelity, and AXA, and the many overlapping and duplicative investment options.

97.    Defendants abdicated their ongoing duty to evaluate each of the proprietary TIAA, Fidelity, and AXA investment options offered—as well as the Vanguard options offered through Fidelity—within the Plans and to engage in a cost-benefit analysis to determine whether the services and the proprietary investment products required by the services providers to be in the Plans were prudent.

98.    The lack of any material changes in the package over many years evidences a lack of independent due deliberation by the Plans' fiduciaries. This abdication resulted in the determination of the package by conflicted service providers.

99.    The Base Plan used TIAA, Fidelity, and AXA as its trio of service providers, while the Supplemental Plan used TIAA and Fidelity as a duo of service providers to administer the Plans for many years, including during the Class Period.  TIAA has provided and continues to provide investment options and services on a bundled basis. The investment fees and administration fees paid to TIAA are based as a percentage of on assets under management. TIAA's bundling requirements mandate the inclusion of TIAA proprietary investment products and TIAA recordkeeping.

100.    Fidelity is a mutual fund company that exclusively offers its proprietary products

---

[12] *Id.*

on an asset-based fee basis. It also serves as custodian for the Vanguard investment options offered in the Plans, from which fees are derived for internal revenue sharing.

101.    Since at least 2009, and during the Class Period, Defendants provided between 130-140 different mutual funds or insurance company annuity products from TIAA, Fidelity, Vanguard, and AXA, many of which entailed higher-cost share classes of mutual funds despite the Plans' tremendous size and bargaining power to demand low-cost investments. The Plans chose to incorporate a large volume of investment options rather than utilizing the Plans' leverage and large bargaining power to obtain volume discounts, which it could have done in a variety of ways, e.g., obtaining fee waivers, concentrating assets into a limited, handpicked menu of investment options.

102.    The Plans' investment menus consisted (and continue to consist) mostly of proprietary TIAA and Fidelity products.  Further, TIAA products are required to be offered in the Plans and cannot be removed without penalty to the Plans and their participants.

**D.    Defendants breached their duty by failing to insist on institutional as opposed to more costly retail share classes.**

103.    From at least 2009 and during the Class Period until 2013, the Plans' TIAA mutual fund offerings were offered solely in more expensive retail shares when less expensive shares were otherwise available. The Plans' Forms 5500 reveal that it was only in 2013 that GWU made the switch to institutional shares of its TIAA mutual funds.

104.    Furthermore, the Fidelity and Vanguard mutual fund offerings have included numerous retail share class funds throughout the Class Period when cheaper share classes were otherwise available for many of those mutual funds. The retail share classes of mutual funds are designed for small individual investors, not large defined contribution retirement plans like the

29

Plans, and are identical in every respect to institutional share class funds, except for much higher fees.

105.    As shown by the sampling of those funds in the table below, for years during the Class Period, Defendants could have designated the institutional share class or other cheaper alternatives for many of the designated TIAA, Fidelity, and Vanguard investment options at substantially lower cost to the Plans' participants. Such institutional class shares and other cheaper share classes are available to large investors like the Plans. However, the Plans failed to use its bargaining power to offer cheaper shares.

106.    Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds that

> Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup . . . .

107.    The Supreme Court has recognized that mutual funds will often waive fees for large retirement plans, and that it is common for investment advisors representing these plans to call mutual funds and request waivers of these investment minimums to secure institutional shares. Industry experts and professionals have acknowledged personally obtaining waivers for plans as small as $50 million in total assets.

108.    Thus, it is commonly understood by investment managers of large pools of assets that, for retirement plans of the Plans' size, the investment provider can make available lower-cost share classes even with respect to particular funds for which the plan does not reach the minimum investment threshold.

109.    There was no rational basis for offering TIAA retail shares prior to 2013 when

institutional shares existed for many years before that; for migrating TIAA mutual funds over to institutional shares but not doing the same for all of the Fidelity and Vanguard investment options; or for including cheaper share classes for only some of the Fidelity and Vanguard investment choices at various points during the Class Period while maintaining more expensive share classes for other funds. If a selection of higher-cost share classes was intended to offset the cost of recordkeeping, it was an exceedingly poor decision, considering the amounts being collected for recordkeeping services.

110.   Despite the availability of far lower-cost options, for years Defendants selected investment options with far higher costs. The following table lists examples of the Plans' designation of retail (or other more expensive share classes) as opposed to lower-cost share classes as investment options with respect to TIAA, Fidelity, and Vanguard mutual funds at various points during the Class Period:

| **EXPENSE RATIO COMPARISON** | | | |
|---|---|---|---|
| **INVESTOR SHARES OFFERED BY THE PLANS** | **EXPENSE RATIO** | **INSTITUTIONAL OR CHEAPER SHARES, FOR THE SAME FUNDS, NOT OFFERED BY THE PLANS** | **EXPENSE RATIO** |
| **Bond Funds** | | | |
| TIAA-CREF Bond Plus Retirement (TCBRX) | 56 bps | TIAA-CREF Bond Plus Institutional (TIBFX) | 31 bps |
| TIAA-CREF Bond Premier (TIDPX) | 46 bps | TIAA-CREF Bond Institutional (TIBDX) | 31 bps |
| TIAA-CREF Bond Index Premier (TBIPX) | 27 bps | TIAA-CREF Bond Index Institutional (TBIIX) | 12 bps |
| Vanguard Inflation Protected Securities Investor (VIPSX) | 20 bps | Vanguard Inflation Protected Securities Institutional (VIPIX) | 7 bps |
| Vanguard Short-Term Investment Grade Admiral (VFSUX) | 10 bps | Vanguard Short-Term Investment Grade Institutional (VFSIX) | 7 bps |
| **Money Market Funds** | | | |

| | | | |
|---|---|---|---|
| TIAA-CREF Money Market Premier (TPPXX) | 29 bps | TIAA-CREF Money Market Institutional (TCIXX) | 14 bps |
| Vanguard Prime Money Market Fund Investor (VMMXX) | 16 bps | Vanguard Prime Money Market Fund Admiral (VMRXX) | 10 bps |
| **Balanced Funds** | | | |
| Fidelity Balanced Fund (FBALX) | 55 bps | Fidelity Balanced Fund Class K (FBAKX) | 46 bps |
| Fidelity Puritan Fund (FPURX) | 55 bps | Fidelity Puritan Fund Class K (FPUKX) | 46 bps |
| **Stock Funds** | | | |
| **Vanguard** Institutional Index Fund Institutional (VINIX) | 4 bps | Vanguard Institutional Index Fund I-Plus (VIIIX) | 2 bps |
| TIAA-CREF Mid-Cap Value Fund Premier (TRVPX) | 56 bps | TIAA-CREF Mid-Cap Value Fund Institutional (TIMVX) | 41 bps |
| TIAA-CREF International Equity Index Retirement (TRIEX) | 31 bps | TIAA-CREF International Equity Index Institutional (TCIEX) | 6 bps |
| Fidelity Contrafund (FCNTX) | 74 bps | Fidelity Contrafund Class K (FCNKX) | 65 bps |
| Fidelity Blue Chip Growth Fund (FBGRX) | 70 bps | Fidelity Blue Chip Growth Class K (FBGKX) | 59 bps |
| Fidelity 500 Index Fund (FUSEX) | 9 bps | Fidelity 500 Index Fund Institutional (FXSIX) | 3 bps |
| Fidelity Growth Company Fund (FDGRX) | 85 bps | Fidelity Growth Company Fund Class K (FGCKX) | 75 bps |
| Fidelity Magellan  Fund (FMAGX) | 68 bps | Fidelity Magellan Fund Class K (FMGKX) | 59 bps |
| Fidelity Low-Priced Stock Fund (FLPSX) | 68 bps | Fidelity Low-Priced Stock Fund Class K (FLPKX) | 58 bps |
| **International** | | | |
| TIAA-CREF International Equity Premier (TREPX) | 64 bps | TIAA-CREF International Equity Institutional (TIIEX) | 49 bps |
| TIAA-CREF International Equity Index Retirement (TRIEX) | 31 bps | TIAA-CREF International Equity Index Institutional (TCIEX) | 6 bps |
| Vanguard Total International Stock Fund Admiral (VTIAX) | 11 bps | Vanguard Total International Stock Fund Inst. Plus (VTPSX) | 7 bps |
| Fidelity Overseas Fund (FOSFX) | 100 bps | Fidelity Overseas Fund Class K (FOSKX) | 89 bps |
| Fidelity Emerging Markets Fund (FEMKX) | 97 bps | Fidelity Emerging Markets Class K (FKEMX) | 83 bps |

111.    As exemplified above, many of the TIAA and Fidelity mutual funds offered as investment options in the Plans during the Class Period were often far more expensive than comparable investment products, including Vanguard mutual funds that were available to the Plans (as indicated by the inclusion of numerous Vanguard products year after year).  For example, as of the end of Plan year 2016, both Plans offered the TIAA-CREF Mid-Cap Value fund (TIMVX), in which approximately $6.15 million of the Base Plan's assets are invested and approximately $7.23 million of the Supplemental Plan's assets are invested. This fund had an expense ratio of 41 bps as of March 31, 2017. The Plan also offered the overlapping, comparable Fidelity Mid Cap Stock fund (FMCSX), in which $2.84 million of the Base Plan's assets are invested and $2.25 million of the Supplemental Plan's assets are invested. This fund had an expense ratio of 58 bps as of June 2017. A comparable Vanguard product, the Vanguard Mid-Cap Value Index Fund (VMVIX), has been available since before the Class Period and had an expense ratio of 19 bps (as of April 27, 2017) – less than half of the cost of the TIAA-CREF Mid-Cap Value fund and roughly 1/3 of the cost of the Fidelity Mid Cap Stock fund. This is the case with many of the TIAA and Fidelity mutual funds offered in the Plan.

112.    Furthermore, Fidelity waives fees for its cheaper share class investment options. For example, Fidelity waives its distribution and service (12b-1) fees, as depicted below, taken from the prospectus for the Fidelity Growth Company Fund Class K (FGCKX)—there was no prudent reason for why Defendants failed to include K Class shares of Fidelity investment options and cheaper share classes of the Vanguard and (until 2013) the TIAA mutual funds in the Plans' menus when they were otherwise available during the Class Period and substantially cheaper:

**Annual Operating Expenses**
(expenses that you pay each year as a % of the value of your investment)

| | |
|---|---:|
| Management fee (fluctuates based on the fund's performance relative to a securities market index) | 0.69% |
| Distribution and/or Service (12b-1) fees | None |
| Other expenses | 0.06% |
| **Total annual operating expenses** | 0.75% |

113.    Lower-cost share classes of the identical TIAA, Fidelity, and Vanguard mutual funds and TIAA annuity products have been available to the Plans for years.

114.    Had the amounts invested in the higher-cost investments instead been invested in the available lower-cost options, the Plans and their participants would not have lost millions of dollars of their retirement savings due to wholly unnecessary fees.

115.    A hypothetical example illustrates just how harmful fees are to the growth of an investment over time, even if they appear to be small at the moment. Assume a $1,000 investment with 8% growth compounded quarterly over 30 years.  With no management fees, that investment will be worth $10,765.16 (Case 1) at the end of the term.  With a 0.1% quarterly management fee, that investment will be worth $9,569.78 after 30 years (Case 2).   With a 0.2% quarterly management fee, that investment will be worth $8,506.16 after 30 years (Case 3).  And, with a quarterly management fee of 0.75% (or 650% excess over 0.1%), that investment will be worth just $4,440.21 after 30 years (Case 4).  The chart below demonstrates the effect of excessive fees and why this is such an important issue of fiduciary oversight:



## E.   Defendants continue to allow the Plans to be saddled with an imprudent bundling structure.

116.   The Plans continue to offer bundled and proprietary investments of the recordkeepers, including numerous investments in overlapping or duplicative investment styles and asset classes, and on a bundled services/products arrangement, all resulting in excessive and unnecessary fees to the Plans, and to the great financial detriment of the Plans' participants. In doing so, the Plans have chosen and continue to retain imprudent TIAA investment options instead of consolidating many of the investment options available in the Plans, purely because the Plans must offer these TIAA products.

117.   For illustration purposes, in the large cap blend investment style for the Plans, Defendants included eight actively managed or passively managed investment options for a combined asset amount of approximately $487 million across both Plans as of December 31, 2016. Those investments are summarized below and compared to a single lower-cost alternative that was available to the Plans: the Vanguard Institutional Index Fund (Inst. Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Investment | 2016 401(a) Plan Assets | 2016 403(b) Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|---|
| CREF Equity Index | $24,708,704 | $20,823,600 | 22.5 bps[13] | 2 bps | 1025% |
| CREF Stock | $171,031,056 | $222,645,864 | 32 bps[14] | 2 bps | 1500% |
| TIAA-CREF Large-Cap Growth Index (Inst.) | $1,756,366 | $3,101,862 | 6 bps | 2 bps | 200% |
| TIAA-CREF Large-Cap Growth (Inst.) | $612,437 | $1,418,638 | 43 bps | 2 bps | 2050% |
| TIAA-CREF Large-Cap Value (Inst.) | $4,302,441 | $4,383,402 | 41 bps | 2 bps | 1950% |
| TIAA-CREF Large-Cap Value Index (Inst.) | $7,115,595 | $9,864,174 | 6 bps | 2 bps | 200% |
| TIAA-CREF S&P 500 Index (Inst.) | $3,726,202 | $3,799,063 | 5 bps | 2 bps | 150% |
| Fidelity 500 Index Fund (Inst.) | $1,843,834 | $5,741,339 | 3 bps | 2 bps | 150% |
| | $215,096,635 | $271,777,942 | | | |
| TOTAL ASSETS | $486,874,577 | | | | |

118.    With over $414 million held in the CREF Equity Index Account and the CREF Stock Account alone, these large cap blend options were roughly 11 and 18 times more expensive than the lower-cost Vanguard option (VIIIX)—another option available in the Plans—with an expense ratio of 2 bps. They were also between 7 and 11 times more expensive than another option available in the Plans—the Fidelity 500 Index Fund (Inst.) with an expense ratio of 3 bps.

119.    Many other large cap index funds are also available at far lower costs than the Plans' large cap blend funds. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index

---

[13] This expense ratio assumes, for the sake of this chart, the lowest expense (i.e., R3) version of this particular TIAA variable annuity product. GWU fails to disclose which class (i.e., R1, R2, or R3) variable annuities are offered in the Plans. Assuming the offerings are actually the most expensive, or R1, the expense ratio for these can be as high as 70 bps.
[14] *See* n.10, *supra*.

Fund (Inst Plus) (VIIIX), Plan participants would have avoided losing millions in excess fees during the Class Period.

120.     The Plans were unable to consolidate the large cap blend options into one or two less expensive index funds because TIAA and Fidelity required that its funds be included in the Plans in conjunction with its provision of services.

121.     There is no prudent reason for Defendants to have locked the Plans into TIAA's and Fidelity's imprudent bundling arrangement and to fail to streamline the Plans' investment menu, as prudent fiduciaries would have done and as fiduciaries of many other similar retirement plans have done.

**F.     Defendants imprudently retained historically underperforming investments in the Plans.**

122.     Defendants' failure to conduct appropriate due diligence in selecting and retaining Plan investments meant numerous investment options underperformed lower-cost alternatives that were available to the Plans.

**1.     CREF Stock Account**

123.     Investments in the CREF Stock Account as of December 31, 2016 represented roughly 20 percent of the Plans' assets, and the CREF Stock Account has been included as an investment option in the Plan from at least 2009 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large-cap blend Morningstar category. This option has for years underperformed and continues to underperform its benchmark and the lower-cost actively and passively managed investments that have been available to the Plans, some of which were included as Plans investment options.

124.     As described above, TIAA-CREF requires the Plans to impose restrictive provisions on the specific annuities that are required to be included in the Plans. Under these terms,

TIAA-CREF requires that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. Prior to the creation of three separate share classes for the CREF Stock Account (and many of TIAA's variable annuity products), the CREF Stock Account paid 56 bps for revenue sharing as administrative expense and "distribution fees" that exceeded other TIAA-CREF investments by over 50% (15 bps).

125.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

126.    Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. Defendants provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large-cap domestic equity market is the most efficient market, and active managers do not outperform passive managers net of fees in this investment style. Instead, Defendants provided these mandatory TIAA-CREF funds in the Plans without determining whether there were prudent alternatives that would be in the best interest of Plan participants and beneficiaries.

127.    Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large-cap index after fees.

That is what, in fact, occurred.

128.    Rather than performing poorly in a single year or two, the CREF Stock Account has persistently experienced poor performance for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the three-, five-, and ten-year periods ended March 29,2018.[15] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. As the performance chart shows, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.

---

[15] Investment returns for the CREF Stock Account during the specified periods are as of February 28, 2018.



129.    The CREF Stock Account R1, with an expense ratio of 71 bps (and even the cheaper R3 class, with an expense ratio of 32 bps) as of February 28, 2018, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps). The Plans had access to these Vanguard funds through Fidelity (and other cheaper Fidelity funds), as disclosed in the Plans' Forms 5500 and as is visible in the Plans' Schedules of Assets where other Vanguard funds are visibly available in the Plans.

130.    The CREF Stock Account is also significantly more expensive than the Fidelity 500 Index Fund (Inst) (FXSIX) (3 bps), which is now available in the Plans after years of offering more expensive shares of this fund, and which has also significantly outperformed the CREF Stock Account for years.

131.    Apart from underperforming passively managed index funds, the CREF Stock

Account fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ended March 29, 2018.[16] These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX), all of which are available to the Plans through Fidelity and Vanguard.



132.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[17]

---

[16] *See supra,* n.12.

[17] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods looking backward from 2009. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the





investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.



133.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 71 bps as of February 28, 2018, was far more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (36 bps), the Vanguard PRIMECAP (Adm) (32 bps), and the Vanguard Capital Opp. (Adm) (37 bps).

134.    Reflecting the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[18] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to

---

[18]Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

generate excess returns over any substantial length of time. *Id.* at 4–5.

135.     TIAA's own literature regarding the CREF Stock Account makes clear that this account has historically underperformed its benchmarks, including the Russell 3000 Index and the Morningstar Large Blend Average:

| Performance | | | | | | |
|---|---|---|---|---|---|---|
| | **Total Return** | | **Average Annual Total Return**[3] | | | |
| | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years |
| CREF Stock Account | 2.08% | 9.17% | 9.17% | 4.83% | 11.55% | 5.03% |
| CREF Composite Benchmark | 2.49% | 10.25% | 10.25% | 5.44% | 11.86% | 5.25% |
| Russell 3000 Index | 4.21% | 12.74% | 12.74% | 8.43% | 14.67% | 7.07% |
| Morningstar Large Blend Average | 3.86% | 10.37% | 10.37% | 6.80% | 13.18% | 6.07% |

136.     ERISA fiduciaries have a continuing duty to monitor investments and remove imprudent ones. In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plans and the opinion of one of the foremost authorities in the retirement investment industry that *no* retirement plan should own this fund.

137.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries must and do replace those imprudent investments with better performing and reasonably priced options. While the Stock Account should have never been included in the Plans through TIAA's bundling arrangement in the first place, under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans, but it was not.

138.    Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, participants of the Plans would not have lost millions of dollars of retirement savings.

### 2.    TIAA Real Estate Account

139.    The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from EBSA just to be able to offer the fund as an investment choice to ERISA plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

140.    Defendants selected and continue to offer the TIAA Real Estate Account as a real estate investment option in the Plans, despite the fact that this investment has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX)—an investment option that is also available in the Plans, *albeit in the more expensive* Admiral share class (VGSLX).

141.    With an expense ratio of 88.5 bps as of December 31, 2014, and a current expense ratio of 85 bps, the TIAA Real Estate Account has been, at times, more than eight times more expensive than the Vanguard REIT Index (Inst), which has an expense ratio of 10 bps.

142.    Simply stating the expense ratio does not tell the whole story of fund expenses for the TIAA Real Estate Account.  TIAA disclosures indicate that included in the TIAA Real Estate Account's investment management fees is the expense of an independent fiduciary, which is

45

retained to approve appraisers of the Account's assets, ensure that acquisitions meet the Account's investment guidelines, and address various other aspects of the operation of the Account that are and should be the obligations of TIAA as the fund manager.  In fact, TIAA selects the appraisers and the fund's investments, and determines all other matters relating to the management of the fund that are then subject to the approval of the independent fiduciary.  The reason that the Real Estate Account needs the services of an independent fiduciary is to ensure that TIAA, as the manager of the fund, does not engage in a variety of prohibited transactions, including self-dealing transactions. By obtaining the approval of the independent fiduciary, TIAA is able to engage in transactions with parties-in-interest, including with related parties, that it otherwise could not engage in. In other words, the independent fiduciary is required in order to allow TIAA to manage the Real Estate Account and offer it as an investment choice to retirement plans. It is an expense that should be borne entirely by TIAA as a cost of engaging in the business—not a legitimate expense of the operation of the fund.

143.    The TIAA Real Estate Account had a history of substantial under-performance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009. Despite this, Defendants selected and continues to retain it in the Plans.



144.    This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the ten-year period ending February 28, 2018.



145.    The very design of the TIAA Real Estate Account creates such operational difficulties, and burdens investors in the fund with such significant additional expense, that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment

47

at all for participant-directed individual account plans like the Plans.

146.   Additionally, the fund invests directly in real property assets that are highly illiquid. In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but, as of May 1, 2017, charges participants an additional 20 basis points for that liquidity guarantee.

147.   The 20 bps "liquidity guarantee" expense of the Real Estate Account is explained by TIAA as simply "enabling the Account to have funds available to meet participant redemption, transfer of or cash withdrawal request." TIAA acknowledges this is a no-value-added "service" because "[t]his guarantee is required by the [New York Department of Financial Services]." This fee is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index Institutional (VGSNX), which has a total expense ratio of 10 bps as of this filing, compared to the TIAA Real Estate Account's total current expense ratio of 85 bps. The TIAA Real Estate Account is significantly more expensive that the pricey Fidelity Real Estate Income Fund (FRIFX) (78 bps) that is also offered in the Plans.

148.   The Real Estate Account charges participants 26.5 basis points for administration expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points.  A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

149.   Finally, during the Class Period the Real Estate Account has charged 12.5 basis points for "distribution fees," and continues to charge 10.5 basis points for distribution. Any

reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA.  The fact that TIAA requires plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

150.    The Real Estate Account's poor performance, coupled with (its current) 85 basis points in unreasonable and excessive fees, makes the TIAA Real Estate Account an exceedingly poor choice by any measure. Defendants' selection of the Real Estate Account as an investment option in the Plans speaks for itself in evaluating the performance of Defendants' fiduciary obligation to act solely in the best interest of participants for the exclusive purpose of providing them benefits under the Plans.

151.    Prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. In contrast, Defendants failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option in both Plans, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

152.    Had Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index or even the Fidelity Real Estate Income Fund—both of which are already available in the Plans, meaning that such participant invested dollars and contributions could have easily been migrated or re-allocated to one of these options—or some other reasonable alternative, Plan participants would not have lost millions of dollars of their retirement savings.

### 3.    TIAA Non-Benefit Responsive Traditional Annuity

153.    The Traditional Annuity prohibits participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other

investments as market conditions or participants' investment objectives change. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they pay a 2.5% surrender charge that bears no relationship to any reasonable risk or expense to which the fund is subject.

154.    The TIAA Traditional Annuity is an insurance company general account product, meaning that all of the assets supporting the annuity contract are held in TIAA's general account, and invested along with all the other assets in TIAA's general account.  All of the assets of the TIAA general account are available to support the obligations of the Traditional Annuity.

155.    One of the fundamental requirements of ERISA is that every contract or agreement between a plan and an investment manager like TIAA must be reasonable. In order to prevent the plan from becoming locked into an arrangement that has become disadvantageous, no contract or agreement is reasonable within the meaning of section 408(b)(2) of ERISA if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances.

156.    As expressly noted in 29 CFR 2550.408b-2(c)(3), a provision in a contract or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination of the contract, arrangement, or lease is not a penalty. For example, a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty. However, such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation of damages.

157.    The 2.5% surrender charge imposed by the TIAA Traditional Annuity on lump sum withdrawals completely fails to take into account the financial conditions of the TIAA general account, and therefore is a clear and patent violation of the prohibition on a penalty for early

withdrawal from the contract. Suppose, for example, that in connection with the investment of participant accounts in the Traditional Annuity, TIAA acquired long-term bonds paying an interest rate of 4%, and that Plaintiff has invested in the Traditional Annuity for twenty years before her retirement. If, at her retirement, those bonds have increased in value by 10% due to changes in prevailing interest rates, and Plaintiff requests a lump sum distribution, TIAA could easily sell those bonds at a profit and pay Plaintiff her lump sum distribution. Instead, getting a lump sum distribution will cost Plaintiff a 2.5% surrender charge, ostensibly to protect TIAA from a loss it would not incur. A surrender charge that is always imposed for the life of a contract, regardless of the term of a participant's investment in the contract and regardless of the financial condition of TIAA's general account at the time of withdrawal, is *per se* unreasonable because it will invariably result in charges that are wholly unrelated to any actual loss.

158. To have accepted these conditions for the investment of plan assets indicates that either (i) Defendants failed in their obligation to thoroughly understand the terms of the contract or (ii) failed to act in the best interest of Plan participants in accepting such unreasonable terms.

159. Even if Defendants were blissfully and excusably unaware of the nature of the surrender change at the time of the initial investment in the contract, the DOL's release of its final regulation under ERISA § 408(b)(2), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure* (the "408b-2 Disclosure Rule"), on February 2, 2012, should have alerted them to the issue.

160. Release of the 408b-2 Disclosure Rule was significant, and no reasonable responsible plan fiduciary could have missed it, since it required affirmative compliance of virtually every plan service provider and fiduciary by July 2012.

161. The 408b-2 Disclosure Rule contains an express provision in 29 CFR 2550.408b-

2(c)(3) addressing the requirement for contacts to be terminable on reasonably short notice without penalty. In fact, insurance companies discussed the issue of surrender charges with the DOL prior to the issuance of the final rule.  As noted in the Preamble to the Interim Final Rule:

> *Other commenters raised questions as to whether certain fees and market value adjustments, generally associated with insurance or insurance-type services and investments, constitute "penalties" for purposes of this paragraph of the regulation*. The regulation provides specifically that "a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty." *The Department believes that questions as to whether, for any particular contract, the charges for contract termination are in fact "penalties," rather than a service provider's recoupment of reasonable start-up costs, are inherently factual questions; accordingly, the Department did not amend the rule in response to these comments.* After consideration of all of the comments on paragraph (c )(2) of the proposal, the Department has determined to adopt that paragraph, without change, in the interim final rule, except that this provision has been moved to a new paragraph (c )(3) of the interim final rule.

(Emphasis added.)

162.    Accordingly, the very existence of a 2.5% surrender charge that never varies regardless of the financial consequence of the withdrawal is unreasonable, and the acceptance of such terms, a breach of fiduciary duty.

## VI.    FAITHFUL FIDUCIARIES AT OTHER INSITUTIONS LONG AGO IMPLEMENTED REFORMS TO IMPROVE PLAN PERFORMANCE AND PARTICIPANT OPTIONS

163.    As the sponsors of other university retirement plans have demonstrated, GWU was fully capable of (but failed in) discharging its responsibilities in a lawful manner for the benefit of the Plans' participants and beneficiaries. The fiduciaries of many other university retirement plans implemented dramatic overhauls to their plans years ago and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

### A.    The Loyola Marymount Example

164.    In its 403(b) Retirement Plan Review Project Overview, the fiduciaries of the Loyola Marymount University ("LMU") 403(b) defined contribution plan recognized that, "Recordkeeping must be consolidated and/or managed by a single party," and that "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services."

165.    To assist LMU in assessing the plan's investment options and recordkeeping services, beginning in 2008, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TIAA.

166.    LMU consolidated from two recordkeepers to one effective on the date the final DOL regulation became effective, January 1, 2009. Moreover, LMU selected Diversified as the new recordkeeper because Diversified did not require bundling investment products or that certain investment options be offered by LMU. LMU was therefore able to offer "best in class" funds in each fund category.

167.    Notably, LMU cited a number of reasons for why it did not select TIAA (and instead selected Diversified) as the recordkeeper, including but not limited to because:

- The annuity products offered by TIAA have not performed as well as the mutual funds offered by other service providers;

- Over the long run, selection of TIAA would result in higher fees paid by faculty and staff;

- TIAA offered less reliable administrative services; and

- TIAA received an unfavorable audit review.

168.    LMU also recognized that the "returns associated with TIAA traditional fixed annuity come at the expense of a severe lock-up period during which an investor who wants to transfer assets out of the account is currently required to move assets out gradually over a period of 10 years."

**B.      The Pepperdine Example**

169.    Pepperdine University followed suit in consolidating from four recordkeepers after determining that it must make certain changes to its retirement plan.

170.    Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper that does not offer proprietary investments, as the sole administrator and consolidated from four recordkeepers (Fidelity, TIAA, Vanguard, and Prudential) to a single recordkeeper.

171.    Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. As identified by Paul Lasiter in his National Association of College and University Business Officers (NACUBO) publication entitled *Single Provider, Multiple Choices*, Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale."

172.    Pepperdine also recognized that the bundled model (discussed herein) demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—whether

54

or not those investments offered participants the best range of choice, value, and relative performance."

173.    Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'" After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."

### C.    The Purdue Example

174.    In the fall of 2008, Purdue University began a comprehensive review of its defined contribution retirement program. According to James S. Almond in *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue recognized that "[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans*, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector."

175.    Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The benefits of Purdue's program enhancements included the transition from five providers (TIAA, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan

assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated $3–4 million per year which is then compounded over time."

### D.  The Caltech Example

176.    Likewise, as reported in an Institutional Investor article called *Caltech Names TIAA-CREF Recordkeeper*, the California Institute of Technology TIAA-CREF DC Retirement Plan consolidated from two recordkeepers (TIAA and Fidelity) to a single recordkeeper (TIAA) effective January 1, 2010, with the assistance of an independent third-party consultant, Mercer Investment Consulting.

177.    In selecting a core set of investment options for the plan, Caltech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the DOL, between 2013 and 2015, Caltech negotiated over $15 million in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

### E.  The Notre Dame Example

178.    In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt noted that "[w]ith the issuance of new Internal Revenue Service

regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."

179.    Hewitt noted several areas of plan improvements. First, recordkeeper consolidation provided "many benefits to participants," including cost savings, and Hewitt identified that "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."

180.    Second, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

181.    As discussed *supra,* extensive industry literature shows that the above university plan sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

182.    According to a 2013 survey of 403(b) plans (LIMRA Retirement Research, 403(b) Plan Sponsor Research), more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants.

183.    The majority of plans use a single recordkeeper because a multi-recordkeeper platform is inefficient and squanders the ability to leverage a plan's bargaining power.

184.    By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants while allowing participants to benefit from a more manageable number of institutional-quality investment options to choose from.

185.    Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

## VII.    ERISA'S FIDUCIARY STANDARDS

186.    ERISA extends fiduciary status to named fiduciaries and functional fiduciaries.   A person is a functional fiduciary to the extent that (1) he or she exercises control over the management of a plan, or any authority or control over plan assets; (2) he or she exercises discretionary authority or control over plan assets; or (3) he or she renders investment advice for a fee or other compensation.

187.    ERISA, imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries for the Plans. Section 1104(a) provides:

> (a) Prudent Man Standard of Care
>
> > (1)  . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
> >
> > > (A) for the exclusive purpose of
> > >
> > > > (i) providing benefits to participants and their beneficiaries; and
> > > >
> > > > (ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

188.    29 U.S.C. § 1103(c)(1) provides that plan assets shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering a plan.

189.    ERISA fiduciaries exercising authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plans, and not for the benefit of others.

190.    Fiduciaries must ensure that the amount of fees paid to service providers is reasonable.

191.    ERISA's fiduciary duties are the highest known to the law and must be performed with an eye single to the interests of participants. The Defendants' fiduciary duties apply continuously in the administration of the Plans and do not abate upon the engagement of service providers or upon an initial selection or approval of Plan investments. The duty to conduct an independent investigation into the merits of a particular investment is a basic aspect of Defendants' fiduciary duties under ERISA. Fiduciaries must use appropriate methods to investigate the merits of plan investments. Fiduciaries must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants. Fiduciaries also have a continuing duty to monitor plan investments and remove imprudent ones. This duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments.

192.    Likewise, Defendants cannot abdicate their ongoing fiduciary duties to the Plans' participants by including a very large number of investment alternatives in the Plans' investment options menu and then leave to the participants the responsibility for choosing among them.

193.     Furthermore, under ERISA, selecting higher-cost investments that benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. Defendants cannot abdicate their ongoing fiduciary duties to conflicted decision-makers.

194.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered *per se* violations because they entail a high potential for abuse. 29 U.S.C. § 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> >
> > * * *
> >
> > (C)  furnishing of goods, services, or facilities between the plan and party in interest;
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

195.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of another fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

196.    Section 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

197.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. § 1109(a). Plaintiff is a participant in both the 401(a) Base Plan and the 403(b) Supplemental Plan.

198.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiff seeks to certify, and to be appointed as representative of, the following class (the "Class"):

All participants in and beneficiaries of the The George Washington University Retirement Plan for Faculty and Staff and The George Washington University Supplemental Retirement Plan from April

13, 2012, through the date of any judgment, excluding the Defendants or any participant that is a fiduciary to the Plans.

199.    Excluded from the Class are Defendants and any fiduciaries to the Plans. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

200.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

201.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that many thousands of Class Members comprise the class. According to Forms 5500 filed with the DOL for the Base Plan and Supplemental Plan year ending December 31, 2016, the Class includes nearly 26,000 participants with account balances across both Plans.

202.    **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

      a.     who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

      b.     whether Defendants were fiduciaries to the Plans under ERISA;

    c.       whether Defendants breached fiduciary duties to the Plans in violation of ERISA;

    d.       whether the Plans and the participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

    e.       if so, the amount of damages or monetary relief that should be provided to the Plans and their participants;

    f.       what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches; and

    g.       whether the Plans and their participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

203.   **Typicality**: All of Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class Members, and the Plans sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of fiduciary duties to the Plans.

204.   **Adequacy:** Plaintiff is an adequate representative for the Class because her interests do not conflict with the interests of the Class that she seeks to represent; she was a participant in the Plans during the Class Period; and she is committed to vigorously representing the Class. Plaintiff has retained counsel competent and highly experienced in complex class action

litigation – including ERISA, securities, shareholder, and other complex financial class actions – and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

205.   **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable and the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) Defendants maintain regarding the Plans. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

206.   Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

207.   Prosecuting separate actions would create a risk of (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards

of conduct for the party opposing the class, or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## CAUSES OF ACTION

## COUNT I

### Breach of Duty of Prudence—Unreasonable Administrative Fees

208.    Plaintiff restates and incorporates the allegations in the preceding paragraphs.

209.    The scope of the fiduciary duties and responsibilities of Defendants includes discharging its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries of the Plans, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA. Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investment options on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

210.    Defendants selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

211.    For years Defendants failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

212.    Had a prudent fiduciary conducted a process for the retention of investment options,

it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

213.    Defendants' failure to properly evaluate the reasonableness of fees being charged to the Plans has caused Plaintiff and the Class millions of dollars in direct economic loss.  The Plans' total losses are continuing, the total amount of which will be determined after completing discovery in this case.

214.     Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of the Duty of Prudence—Unreasonable Investment Management Fees and Performance Losses

215.    Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

216.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants have a continuing duty to ensure that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

217.    Defendants selected and retained as Plan investment options investment funds and

insurance company annuities with far higher expenses and poorer performance relative to other investment options that were readily available to the Plans at all relevant times.

218.    Rather than consolidating the Plans' many investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained duplicative investment options in each asset class and investment style, thereby depriving the Plans of the ability to qualify for lower-cost share classes of certain investments and, in addition, confusing Plan participants by providing them a dizzying array of investment options.

219.    Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plans.

220.    CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

221.    TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

222.    TIAA Traditional Annuity: Defendants failed to thoroughly evaluate the surrender charges imposed on Plan participants wishing to take a lump sum distribution or, worse, knowingly saddled participants with severe restrictions on their ability to withdraw from the Traditional Annuity, even at retirement, without the imposition of a penalty.

223.    Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for

reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

224.    Total Plan losses will be determined after complete discovery in this case and are continuing.

225.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans on any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

**Breach of the Duty of Prudence — Bundled Recordkeeping and Proprietary Funds**

226.    Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

227.    Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

228.    Defendants were required independently to assess the prudence of each investment option for the Plans on an ongoing basis, and to act prudently and solely in the interest of the Plans' participants in deciding whether and how to maintain a recordkeeping arrangement.

229.    Defendants were also required actively to monitor and remove investments that were no longer prudent for the Plans.

230.    Defendants failed to do this because they saddled the Plans with the recordkeeping services of TIAA, Fidelity, and AXA, which required the inclusion of those service providers' own proprietary investment products in the Plans.

231.    For example, by allowing TIAA's bundled services and TIAA's mandated inclusion of proprietary investment options in the Plans, allowing TIAA to place its other proprietary investment options in the Plans, and permitting TIAA to require that it provide recordkeeping services for its proprietary products, Defendants committed the Plans to an imprudent arrangement in which certain investments were required to be included and could not be removed even if and despite that they were no longer prudent investments, and prevented the Plans from using alternative recordkeepers who could provide superior services at a lower cost.

232.    In so doing, Defendants precluded themselves from being able to fulfill their duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By allowing TIAA to dictate these terms, Defendants favored the financial interests of TIAA in receiving a steady stream of revenues from TIAA's proprietary funds over the interest of participants.

233.    As a result of Defendants' decision to include underperforming and excessively overpriced investment options like the CREF Stock Account and the TIAA Real Estate Account, and to allow for TIAA and Fidelity recordkeeping services without evaluating the prudence of these options, Defendants are liable to make good to the Plans all losses resulting from its breach pursuant to 29 U.S.C. § 1109(a).

234.    Had a prudent fiduciary conducted a prudent process for evaluating and retaining recordkeepers, it would have concluded that the Plans' recordkeepers and their proprietary investment options were retained for reasons other than the best interest of the Plans and their

69

participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

235.    Total Plan losses will be determined after complete discovery in this case and are continuing.

236.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans on any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

### Breach of the Duty of Prudence – Multiple Recordkeepers

237.    Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

238.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

239.    For years, the Plans have had either a duo (TIAA and Fidelity) or a trio (TIAA, Fidelity, and AXA) of recordkeepers, each of which charged layers of fees to the Plans and their participants for duplicative and unnecessary Plan services.

240.    Defendants, for years, retained multiple recordkeepers to administer the Plans when

prudent fiduciaries would have consolidated the recordkeeping services, put recordkeeping out for a competitive bidding process, and overhauled the recordkeeping fee structure years ago.

241.    Had a prudent fiduciary conducted a prudent process for evaluating and retaining recordkeepers, it would have concluded that the Plans' recordkeepers and their proprietary investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

242.    As identified above, industry experts recognize that prudent fiduciaries consolidate recordkeepers and utilize only one recordkeeper after putting these services out for a competitive bidding process. Indeed, prudent fiduciaries of other university retirement plans (*supra*) have made this change to the recordkeeping structure.

243.    Total Plan losses will be determined after complete discovery in this case and are continuing.

244.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans on any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully requests that this Court:

(a)    Find and declare that the Defendants have breached their fiduciary duties as described above;

(b)     Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

(c)     Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

(d)     Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under § 1109(a);

(e)     Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

(f)     Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

(g)     Reform the Plans to include only prudent investments;

(h)     Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

(i)     Certify the Class, appoint Plaintiff as a class representative, and appoint Chimicles & Tikellis LLP, Franklin D. Azar & Associates, P.C. and Migliaccio & Rathod LLP as Class Counsel;

(j)     Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(k)     Order the payment of interest to the extent it is allowed by law; and

(l)     Grant other equitable or remedial relief as the Court deems appropriate. .

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury.

Dated: April 13, 2018                    Respectfully submitted,

By: */s/ Jason S. Rathod*

    Jason S. Rathod* (D.C. Bar No. 100082)
    Nicholas A. Migliaccio* (D.C. Bar No. 484366)
    MIGLIACCIO & RATHOD LLP
    412 H Street Suite 302
    Washington, D.C. 20002
    Tel: (202) 470-3520
    Fax: (202) 800-2730
    nmigliaccio@classlawdc.com

    CHIMICLES & TIKELLIS LLP
    Steve Schwartz **
    Andrew W. Ferich**
    361 West Lancaster Avenue
    Haverford, PA 19041
    Tel: (610) 642-8500
    Fax: (610) 649-3633
    steveschwartz@chimicles.com
    awf@chimicles.com

    CHIMICLES & TIKELLIS LLP
    Robert J. Kriner, Jr.**
    222 Delaware Avenue, Suite 1100
    Wilmington, DE 19801
    Tel.: (302) 656-2500
    Fax: (302) 656-9053
    rjk@chimicles.com

    FRANKLIN D. AZAR & ASSOCIATES, P.C.
    Franklin D. Azar**
    Paul R. Wood**
    Keith R. Scranton**
    14426 E. Evans Ave.
    Aurora, CO 80014
    Tel.: (303) 757-3300
    Fax: (303) 757-3206
    Azarf@fdazar.com
    woodp@fdazar.com
    scrantonk@fdazar.com

    *Attorneys for Plaintiff*

    *   Admitted to the court
    ** *Pro hac vice* motions forthcoming